IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KRISTIN MAXON,<br><br>   Plaintiff,,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>   Defendant. | No. C08-3028-PAZ<br><br>**MEMORANDUM OPINION AND ORDER** |

_____

  This matter is before the court for judicial review of the defendant's decision denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income benefits under Title XVI of the Act. The plaintiff Kristin Maxon protectively filed her applications on February 27, 2004, alleging disability since July 1, 2003. Her applications were denied initially and on reconsideration. She had a hearing before an Administrative Law Judge ("ALJ") on March 29, 2006. On September 29, 2006, the ALJ issued his decision, finding that Maxon could return to her past relevant work, and she therefore was not disabled.

  On May 31, 2007, the Appeals Council remanded the case for appropriate consideration of Maxon's functional abilities with and without the abuse of substances, consideration of a consulting psychologist's opinions that Maxon has an adjustment disorder, and further discussion of the rationale underlying the ALJ's assessment of Maxon's residual functional capacity. *See* A.R. 103-04. The ALJ held a second hearing on September 17, 2007. On January 4, 2008, he again denied Maxon's applications for benefits, finding that although Maxon is unable to return to her past relevant work, she retains the residual functional capacity to perform other semi-skilled work, and she therefore is not disabled. He found that Maxon's past history of substance abuse was not

a material factor in the disability determination. A.R. 25. The Appeals Council denied Maxon's request for review, making the ALJ's decision the final decision of the Commissioner.

Maxon filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. She argues the ALJ erred in failing to give appropriate weight to the opinions of her treating physician, in finding her subjective complaints not to be fully credible, and in posing an inaccurate hypothetical question to the Vocational Expert. On June 3, 2008, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The issue before the court is whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court considers the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

Maxon injured her low back while playing volleyball in July 2003, when she was thirty-four years old. She experienced low back pain and tenderness, although her range of motion and strength remained good. X-rays of her back in August 2003, showed "severe intervertebral disc space narrowing at L5-S1 with grade II spondylolisthesis of L5 on S1 due to an obvious spondylolysis," and "accelerated degenerative joint disease at L5-S1." A.R. 251. Initially, she was treated with chiropractic manipulations, physical therapy, injections by a pain management physician, and oral pain medications, including Ultracet, ibuprofen, and a muscle relaxant. She also was taking Lexapro, an antidepressant medication. Records indicate Maxon stopped taking her Lexapro despite

continued anxiety, and in November 2003, her doctor again prescribed the medication. A.R. 244-45.

In early 2004, Maxon received additional epidural injections. She was examined by a neurosurgeon in February 2004, and the neurosurgeon prescribed additional physical therapy, finding that surgical treatment was not appropriate at that time. The physical therapist noted Maxon was not doing home exercises as directed, and she frequently missed her scheduled appointments. She was scheduled for another epidural steroid injection on February 13, 2004, but the injection was not administered because Maxon had been consuming alcohol. She received epidural injections in March and April 2004, and her doctor also prescribed a trial of a TENS unit. At the time of her April 19, 2004, injection, the doctor noted Maxon had "hardly been using any hydrocodone and she ha[d] quite a few pills left over from previous prescriptions." A.R. 282. In addition, Maxon had been prescribed Neurontin, which she was only taking as needed. The doctor advised her to take the Neurontin on a regular basis. A.R. 282-83.

In April 2004, a neurosurgeon suggested surgery might be appropriate for Maxon, but he advised her that she would have to stop smoking and reduce her alcohol intake before surgery would be considered. In May 2004, Maxon was switched from hydrocodone to oxycodone, a stronger opiod-based pain medication. She had additional epidural steroid injections in June, August, and October 2004. In September 2004, Maxon saw her doctor for follow-up of her low back pain, extending down both legs. She indicated her pain was under better control on five to six Oxycodone per day, without side effects. She complained of difficulty sleeping at night secondary to pain. Examination showed "[m]inimal tenderness in the lower lumbosacral spine," with no muscle spasm on palpation and 5/5 bilateral motor strength. The doctor prescribed twice daily MS Contin, a strong time-released morphine formulation, and amitriptyline at bedtime. Maxon also was continued on Oxycodone for breakthrough pain.

On November 17, 2004, Maxon saw her doctor for follow-up. She reported good relief after her October 29, 2004, epidural steroid injection. Notes indicate that prior to the injection, Maxon had suffered a severe beating from her boyfriend, who stomped on her low back and kicked her. She reported lower pain levels in her buttocks and legs after the injection, rating her pain at 3 to 4 out of 10. She was taking MS Contin 30 mg orally twice a day, Oxycodone for breakthrough pain, amitriptyline at night, Lorazepam once daily, and Clonazepam daily. Examination revealed "[n]o tenderness in the lower lumbosacral spine on palpation," no muscle spasms, full motor strength, and negative straight-leg-raising. However, the doctor noted "progression of the spondylolysis at L5-S1 since prior examination," and "evidence of lumbar degenerative disc disease at L5-S1." A.R. 404. The doctor prescribed an escalating dose of Neurontin for the neuropathic component of Maxon's pain symptoms. *Id.*

At Maxon's next follow-up exam on December 21, 2004, she reported increased back pain, and periodic numbness and paresthesias in her lower extremities. She had been packing to move and felt that might have exacerbated her pain. She also reported sleeping poorly. On examination, she exhibited minimal tenderness on palpation of the lower lumbar spine, full range of motion in all directions, and full motor strength. The doctor increased Maxon's Neurontin to 600 mg three times daily, and increased her amitriptyline at bedtime. Her prescriptions for MS Contin and Oxycodone were renewed.

Maxon had additional epidural steroid injections in February and April 2005. Maxon began complaining of pain in her cervical spine in April 2005, and an MRI in May 2005, showed mild spondylosis change at C5-6 with some broad-based disc osteophytes at C5-6, with no cord trapping or impingement. She had another epidural steroid injection in August 2005. On September 27, 2005, Maxon reported that the MS Contin continued to help her pain, but not as much as before. She was taking Flexeril for muscle spasms, oxycodone and Neurontin for pain, and amitriptyline at night. The doctor increased

4

Maxon's MS Contin dosage to 45 mg twice daily. Maxon had additional epidural injections in November 2005, and January 2006.

A repeat MRI of Maxon's lumbar spine in February 2006 showed "[e]xtremely severe spondylolisthesis at L5-S1 producing central canal stenosis and crowding of dural sac and contents to a mild degree," but without severe encroachments of the vertebral foramina or nerves, and no disc herniations encroaching on her spinal canal. Maxon again was advised that if she were to have fusion surgery, she would have to stop smoking. She indicated she wanted to "think over her options." A.R. 447.

Maxon began seeing John Birkett, M.D. in February 2006 for general medical concerns as well as follow-up of her back pain. On February 10, 2006, Dr. Birkett noted Maxon's gait and station were normal, she "moves through range of motion with fair amount of ease in all areas," and she evidenced "[g]ood strength and musculature bilaterally." A.R. 669. The purpose of her visit that day was for an annual physical, including a gynecological exam. She saw the doctor again March 1, 2006, specifically for follow-up of her low back pain. At that time, he noted Maxon's gait was slow, her neurologic reflexes were symmetrical but diminished bilaterally, and she had notable lumbar tenderness. He continued all of the medications Maxon had been prescribed previously, including MS Contin, Neuron, amitriptyline, oxycodone, Flexeril, and another pain medication that is illegible in the record. *See* A.R. 668.

In May 2006, Maxon saw Dr. Birkett with complaints of her fingers, toes, and feet turning white. He opined it could be Raynaud's Phenomenon, and referred her to a specialist for evaluation. The specialist diagnosed Maxon with Raynaud's Phenomenon, "[n]ot quite severe at this time." A.R. 683. He indicated the most helpful measure Maxon could take for her symptoms would be to quit smoking. He also prescribed an elbow splint, rest, over-the-counter NSAIDs, and icing for tennis elbow.

Maxon saw Dr. Birkett again in November 2006, requesting a "slip saying she can't work." He wrote a note stating Maxon was "unable to work due to chronic spine problems." A.R. 639.

In June 2007, Maxon requested another opinion regarding her back problems, and Dr. Birkett referred her to Sam Kaspar, M.D., for evaluation. Dr. Kaspar recommended she try Neurontin again, which Maxon apparently had discontinued at some point due to gastrointestinal upset. He also noted, again, that surgical treatment would require Maxon to stop smoking. He indicated Maxon "had significant functional limitations, [is] on a lot of medications, and may be just the person who might benefit from surgery." A.R. 691. He referred Maxon back to the pain clinic for further injections and other conservative treatment, which he preferred she exhaust prior to having surgery. However, doctors at the pain clinic did not feel additional injections would provide any long-term relief, based on Maxon's history. They recommended she proceed with surgery, and she was referred back to Dr. Kaspar.

In September 2007, Dr. Birkett completed a Residual Functional Capacity questionnaire in which he indicated Maxon's prognosis was "guarded without surgery." A.R. 641. He indicated Maxon had reduced ranges of motion, and her pain symptoms would interfere with her attention and concentration constantly. Her medications were likely to produce dizziness and drowsiness that could affect her ability to work, and he expected her impairments to last at least twelve months. Dr. Birkett opined Maxon could walk two blocks without rest or severe pain; stand for forty-five minutes at a time before having to change position; and sit and stand/walk for less than two hours, total, in an eight-hour work day. He indicated Maxon needs to walk around every forty-five minutes for fifteen minutes at a time, and she would require a job that allowed her to change positions at will from sitting to standing or walking. He opined she would require a fifteen-minute break every forty-five minutes. He further opined there was no emotional component to Maxon's pain. A.R. 641-44.

Dr. Birkett opined Maxon could lift and carry less than ten pounds occasionally and ten pounds rarely, and she could occasionally crouch/squat and rarely climb stairs. He indicated Maxon has significant limitations with reaching, handling and fingering, opining she could perform those types of activities for no more than 20% of the work day. He recommended she avoid extreme humidity and temperature extremes, and he opined Maxon would miss more than four days of work per month as a result of her impairments or treatment. A.R. 644-45.

Maxon underwent a complex lumbar reconstructive and decompressive surgery on October 15, 2007. Her postoperative "changes showed excellent stabilization of spondylolisthesis at L5-S1," with placement of hardware and cage insertion. She was discharged on October 20, 2007, in "excellent condition." She was ambulating and eating independently. A.R. 694-96.

Maxon has four years of college, with two associate's degrees. She has worked as a waitress/food server, and also has trained others to perform this job; a landlord at an apartment house; and a telecommunications technician at a large chemical plant. She also spent some time cleaning houses. Maxon characterizes herself as "a very hard worker" with good body strength, and she hoped to get retrained and return to the workforce after she recovered from her back surgery. A.R. 214, 747.

A vocational expert testified at the ALJ hearing. The ALJ asked the VE to consider an individual of Maxon's age, and with her education and work history, who can lift ten pounds occasionally and five pounds frequently, stand for two hours in an eight-hour work day, for forty-five minutes at a time and then a slight positional change; sit for six hours in the work day; walk two blocks; perform all postural tasks occasionally except no ladder climbing; and tolerate occasional exposure to all hazards and environmental conditions. In addition, the individual would miss one day of work per month. The VE indicated the hypothetical individual would be unable to perform any of Maxon's past relevant work, but would be able to perform routine clerical activities such as reviewing applications at

an insurance company, or being a sorter, file checker, or receptionist. All of these jobs are sedentary and semi-skilled, and they require skills Maxon would have acquired in her previous work including the ability to deal with people, to record basic information, and to perform general clerical skills. A.R. 749-52.

The ALJ found that Maxon's degenerative disc disease of the lumbosacral and cervical spine constitutes a severe impairment, but does not meet the Listing level of severity. *See* 20 C.F.R. part 404, subpt. P, App. 1. He assessed Maxon's residual functional capacity as follows:

> [T]he claimant has the residual functional capacity to perform sedentary work, which demands lifting/carrying no more than 10 pounds occasionally and no more than 5 pounds frequently. She can sit 6 hours total in an 8-hour workday, and stand 2 hours total in an 8-hour workday with slight positional changes after 45 minutes for a couple of minutes at a time. She can walk 2 blocks at a time, and she can never climb ladders. She can occasionally climb stairs, balance, stoop, kneel, crouch and crawl; and she can be exposed no more than occasionally to extremes of heat and cold, humidity, wetness and hazards such as unprotected height and moving machinery. She could miss one day of work each month due to her impairment.

A.R. 20.

The ALJ found Maxon's subjective complaints regarding the severity of her symptoms not to be entirely credible. He noted objective examination findings had "been limited to tenderness of the paralumbar area, less severe than the claimant alleged," and none of her clinical examinations had revealed positive signs of neurologic problems. A.R. 22. He further noted that Maxon had failed to stop smoking to allow her to go forward with surgery.

The ALJ gave no weight to Dr. Birkett's indication that Maxon was "unable to work due to chronic spine problems," because he found the statement to be general in nature, "without any rationale for its conclusion." A.R. 23. The ALJ gave only minimal weight to the residual functional capacity questionnaire completed by Dr. Birkett because the ALJ

8

did not have the doctor's treatment notes to substantiate the doctor's responses on the questionnaire, and the ALJ found the other record evidence did not support the limitations indicated by Dr. Birkett. *Id.* The ALJ found the "extreme restrictions" indicated by Dr. Birkett were inconsistent with Maxon's neurologic examinations, which had been "consistently normal"; Maxon had "declined surgery either by direct decision or else in effect by failing to quit smoking"; she had "not taken as much pain medication as she has been given prescriptions for"; she had not sought emergency room treatment for pain; and she "rarely missed medical appointments." *Id.* He further noted that treatment notes from all of Maxon's doctors indicate she "always attends to her grooming, hygiene and dress, and at medical appointments, has always exhibited an appropriate demeanor without any significant pain behavior. She has admitted that she lives with and takes care of her two sons, one of whom was only 3 years old in April 2004, and she also drives, shops, prepares meals, does laundry, keeps her home neat and clean, and demonstrates an adequate level of overall independent functioning." A.R. 23-24.

Based on his residual functional capacity assessment, the ALJ concluded Maxon cannot return to any of her past relevant work, but she has transferable skills and can make a successful adjustment to other types of work. He therefore concluded Maxon is not disabled. A.R. 24-25.

It is significant that by the time the ALJ issued his written decision in Maxon's case, Dr. Birkett's treatment notes were part of the record. In addition, that ALJ knew Maxon was scheduled for surgery based on her testimony at the second ALJ hearing, and her surgery was performed prior about four months prior to the ALJ's issuance of his decision. The ALJ erred in failing to consider Dr. Birkett's treatment records and the records from Maxon's surgery in connection with the ALJ's assessment of Maxon's functional abilities.

> The opinion of a treating physician is accorded special deference under the social security regulations. The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight,"

9

> provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).

*Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Here, Dr. Birkett's assessment is fully supported both by his own treatment notes and by other substantial evidence in the record.

As the Eighth Circuit Court of Appeals has noted repeatedly, the appropriate inquiry is whether substantial evidence in the record as a whole supports the ALJ's findings that a claimant can perform "'the requisite physical acts day in and day out, in the sometime competitive and stressful conditions in which real people work in the real world.'" *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)). In the present case, the evidence does not support such a finding. Since the time of Maxon's original injury in July 2003, there has never been a time when she stopped complaining of significant pain or stopped seeking treatment. It is readily apparent that her treating physicians found her complaints to be credible, as evidenced by the increasingly larger doses of strong narcotic pain medications they prescribed for her. Maxon's ability to carry on with much of her ordinary daily routine is not evidence that she could work. "[A]n SSI claimant need not prove that she is bedridden or completely helpless to be found disabled and the fact that claimant cooks and cleans for herself, shops for groceries, does laundry, visits friends, attends church, and goes fishing does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity." *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir. 1991) (citing *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)).

Further, because the hypothetical question posed to the VE did not contain all of Maxon's impairments as supported by the record, the VE's opinion does not constitute substantial evidence to support the ALJ's decision. *Pickney v. Chater*, 96 F.3d 294, 296

(8th Cir. 1996); *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) (citing *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994)).

The court finds the record does not contain substantial evidence to support the Commissioner's decision that Maxon was not disabled. However, the record also does not contain overwhelming evidence that Maxon *remained disabled* following her surgery. The record contains overwhelming support to award benefits immediately for the time period from July 1, 2003, to October 20, 2007, when Maxon was discharged from the hospital following her surgery in "excellent condition." The evidence suggests Maxon's back problem may have resolved as a result of the surgery, and Maxon expressed an intention and desire to retrain and return to work after surgery. Therefore, the matter must be remanded for further development of the record regarding Maxon's condition after that time.

Accordingly, the Commissioner's decision is **reversed** for the time period from July 1, 2003, to October 20, 2007, and this matter is **remanded** for immediate calculation and award of benefits for that time period. Further, the case is **remanded** for further development of the record as to whether Maxon remained disabled following October 20, 2007.

**IT IS SO ORDERED.**

**DATED** this 27th day of March, 2009.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT